UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

GARY CARTY,                                   )
                                              )
        Plaintiff,                            )
                                              )
v.                                            )        Civil No. 3:15-cv-01186
                                              )        Judge Aleta A. Trauger
METROPOLITAN LIFE INSURANCE                   )
COMPANY, EASTMAN CHEMICAL                     )
COMPANY WELFARE BENEFIT                       )
PROGRAM, and EASTMAN CHEMICAL                 )
COMPANY, as Plan Administrator for the        )
EASTMAN CHEMICAL COMPANY                      )
WELFARE BENEFIT PROGRAM,                      )
                                              )
        Defendants.                           )

**MEMORANDUM**

Before the court are three motions for judgment on the administrative record. Two of the

defendants, Eastman Chemical Company and the Eastman Chemical Company Welfare Benefit

Program (collectively, "Eastman"), have filed a Motion for Judgment on the Administrative

Record (Docket No. 38), to which plaintiff Gary Carty has filed a Response (Docket No. 49) and

Eastman has filed a Reply (Docket No. 50). The third defendant, Metropolitan Life Insurance

Company ("MetLife"), has filed a Motion for Judgment on the Administrative Record, in which

it adopts and incorporates by reference the arguments raised by Eastman (Docket No. 40), along

with a Reply (Docket No. 51) adopting and incorporating Eastman's Reply to Carty's Response.

Finally, Carty has filed a Motion for Judgment on the ERISA Record (Docket No. 41), to which

Eastman has filed a Response (Docket No. 47) and MetLife has filed a Response adopting and

incorporating Eastman's Response (Docket No. 48), and Carty has filed a Reply (Docket No.

52). For the reasons discussed herein, the motions filed by Eastman and MetLife will be denied,

Carty's motion will be granted, and Carty's claim will be remanded to MetLife for further consideration.

## BACKGROUND

This action – brought under the civil enforcement provisions of the Employee Retirement Income Security Act, 29 U.S.C. § 1132 *et seq.* ("ERISA") – concerns the discontinuation of Carty's long term disability ("LTD") benefits. Carty, as a former Eastman Chemical Company employee, is a beneficiary under the self-funded LTD Plan of the Eastman Chemical Company Welfare Benefit Program. (Docket No. 1 ¶¶ 4, 6, 9.) MetLife is the claims administrator of the LTD Plan. (*Id.* at ¶ 5.) Carty stopped working for Eastman on November 28, 2013, and was approved for LTD benefits beginning on June 8, 2013. (*Id.* at ¶¶ 14, 17.) MetLife terminated Carty's benefits by letter dated April 17, 2015. (*Id.* at ¶ 18.) Carty exhausted his administrative appeals and filed the instant action challenging the cessation of his benefits. (*Id.* at ¶¶ 20–21.)

### I. Applicable Plan Provisions

The LTD Plan states that its purpose is to "provide[] continuing income when you are unable to work due to an extended disability." (Administrative Record ("AR") (Docket Nos. 18–27, 33) at 1070.) The Plan lists a number of requirements, all of which must be met, "[t]o be considered disabled under the LTD [Plan]." (*Id.* at 1071.) After the first eighteen months of benefits, the Plan provides that, to continue to be considered disabled, "you may not earn more than 50% of your pre-disability earnings from any employer in your local economy at any gainful occupation for which you are reasonably qualified taking into account your training, education and experience." (*Id.*)

The Plan also requires that the recipient be receiving "appropriate care and treatment," defined as follows:

Appropriate care and treatment means medical care and treatment that is:

- o given by a licensed physician whose medical training and clinical specialty are appropriate for treating your condition;

- o consistent in type, frequency, and duration of treatment with relevant guidelines of national medical research, health care coverage organization and governmental agencies applicable to your condition;

- o consistent with a licensed physician's diagnosis of your condition; and

- o intended to maximize your medical and functional improvement.

(*Id.*)

The plan provides for ongoing review and reconsideration of eligibility: "The Claims Administrator periodically reviews your continued eligibility for LTD Plan benefits. You must cooperate with and respond to any request that the Claims Administrator makes relating to your claim." (*Id.* at 1077.) "If the Claims Administrator determines that you are no longer eligible for LTD benefits, your benefits will terminate at the end of the month that determination is made." (*Id.*) However, "benefits will terminate immediately on . . . the date you are no longer disabled because you are engaging in gainful work[, or] the date the Claims Administrator determines that you are not receiving Appropriate Care and Treatment." (*Id.* at 1078.)

The Plan grants MetLife discretion in construing the Plan and determining eligibility:

[MetLife] shall have the complete discretionary authority to control the operation and administration of this Program, with all powers necessary to enable it to properly carry out such responsibilities, including, but not limited to, the power to construe the terms of this Program, to determine status, coverage and eligibility for Benefits and to resolve all interpretive, equitable and other questions that shall arise in the operation and administration of the Program.

(*Id.* at 1062.) Among the powers expressly granted MetLife are the power "to exercise discretion in interpreting the Program, its interpretation thereof in good faith to be final and conclusive on all persons claiming Benefits under the Program." (*Id.*) Eastman is ultimately

responsible for funding any benefits awarded under the program. (*Id.* at 1014.)

## II. Carty's Medical and LTD History

Before leaving work due to his disability, Carty was a manager in Eastman's information technology department. (AR at 628.) According to Eastman's job description for the position, Carty's responsibilities "include[d] understanding how IT-related capabilities enable business processes" and "design[ing], develop[ing] and deploy[ing] the necessary software and/or hardware solution to fulfill [business] requirements." (*Id.* at 620.) His salary was $126,200 per year. (*Id.* at 592.) His long-term disability claim form indicates that he suffered from bipolar disorder, anxiety, and depression, for which he was first treated in October of 2011 and which resulted in his eventual disability on November 28, 2012. He identified his treating physician for the disabling conditions as Dr. Ronald Smith of Kingsport, Tennessee. (*Id.* at 628.)

### A. Treatment by Dr. Smith

Ronald Smith is a physician who is board certified in psychiatry. (AR at 173–74.) On August 6, 2015, Dr. Smith gave a statement in which he testified that he began seeing Carty in November of 2011 and that Carty has a diagnosis of "bipolar type two disorder most often in depressed phase, and generalized anxiety disorder with episodes of panic." (*Id.* at 174–75.) When asked if Carty had been compliant with his treatment regiment, Dr. Smith testified:

> He's attended therapy sessions as scheduled. In the years I've seen him he has missed an occasional appointment, but he has been compliant. He's taking – he has taken the medicine I've given him or at least tried to take them and ran into side effects and make [sic] alterations in the regimen so he could tolerate it.

(*Id.* at 176.) Dr. Smith conceded that, when he "first saw [Carty,] the bipolar diagnosis wasn't clear," but that Dr. Smith eventually identified "mood cycling" indicative of bipolar disorder. (*Id.* at 177.) According to Dr. Smith, Carty continued to exhibit at least periodic uncertainty about the bipolar disorder diagnosis, but his symptoms would eventually reassert themselves:

4

We put him on just antidepressant, antianxiety medicine, but that was not helpful because of mood changes that would – when the cycling would occur, irritability would occur, greater anxiety. . . . There was continually a sense on his part [of] do I really need the mood regulator or the antipsychotic medicines because he'd have side effects from it and there was often a denial that I really need to be on the mood regulator. I really just have depression and anxiety as opposed to bipolar. But then we would start seeing his mood cycling, the irritability, the racing thoughts, the inability to sleep, the hyper quality, and so then we go back to, okay, let's go back to the antipsychotic medicines.

(*Id.* at 178–79.) Dr. Smith testified that he did not believe Carty could maintain gainful employment because Carty, when faced with even a "modest degree of external stresses[,] . . . becomes overwhelmed[,] and anxiety and depression, racing thoughts, [and] irritability escalate[] to a point where he would be unable to function in a job outside his home." (*Id.* at 181.) According to Dr. Smith, he and Carty did eventually identify a combination of medicines that appeared to help Carty, but Carty discontinued the medications because he could not afford them. (*Id.* at 184.) Dr. Smith also described referring Carty to Dr. Edward Latham "to be working on psychological or interpersonal or cognitive issues." (*Id.* at 175.)

### *B. Treatment by Dr. Latham*

Dr. Latham is a Kingsport-based practicing clinical psychologist with a Ph.D. in clinical psychology and M.S. and B.A. degrees in psychology. (AR at 118.) Dr. Latham's records show that he first saw Carty on March 18, 2013, and that Carty's "presenting problem" was "learning to cope with his bipolar disorder." (*Id.* at 85.) Carty continued to see Dr. Latham consistently through June of 2013, after which his record shows a number of rescheduled sessions and significantly less frequent attendance. (*Id.* at 86–87.) Carty did, however, continue to see Dr. Latham, and the two discussed issues ranging from the management of Carty's bipolar symptoms to a wide array of family and personal issues related to Carty and his well-being. (*Id.* at 85–89.) Between March 18, 2013, and May 7, 2015, Carty and Dr. Latham had a total of fourteen

sessions.  (*Id.*)  During that period, the record shows nine appointments that Carty rescheduled, four that he cancelled, and two that Carty did not attend and did not apparently reschedule.  (*Id.*)

Dr. Latham's notes show that, on May 5, 2014, he and Carty explicitly discussed Carty's functioning, including in a workplace setting.  Dr. Latham described Carty's tendency to argue as "not aggressive or threatening but more active disagreement because of the typical bipolar inflated belief that he knows."  (*Id.* at 87.)  The notes also observe that Carty's poor attendance of his psychotherapy sessions demonstrated that Carty was not reliable about attending to commitments, and that Carty would instead sometimes spend days in bed without attending to basic tasks, and that at other times even small questions in his everyday life would "stymie him and shut him down with worry."  (*Id.*)

On August 4, 2014, Dr. Latham testified about his treatment of Carty.  (*Id.* at 92.)  Dr. Latham acknowledged that Carty was "a long-term patient of Dr. Smith, who was treating him for a cyclic mood disorder, a bipolar disorder, and for anxiety."  (*Id.* at 95.)  Dr. Latham characterized his own treatment of Carty, however, as focused on "issues related to dealing with his life situation and his relationships like his marriage and with his daughter and with others." (*Id.*)  Dr. Latham said that Dr. Smith's diagnosis of bipolar disorder was consistent with his own observations of Carty's symptoms.  (*Id.* at 96.)

### *C. Award of LTD Benefits*

Carty submitted his paperwork seeking LTD benefits on March 8. 2013.  (AR at 591.) MetLife engaged in a review of Carty's claim that involved both interviewing Carty and reviewing information and records from Dr. Smith.  (*Id.* at 643–90.)  The log of MetLife's processing of the claim shows that, on April 21, 2013, a MetLife claims specialist reached the initial claim decision that Carty's condition resulted in his "inability . . . to perform the duties of

his job" and that his claim would therefore be approved. (*Id.* at 690.) Carty was informed that his claim was approved by letter of May 29, 2013. (*Id.* at 469.) MetLife's log shows that its claim specialists continued to monitor Carty's treatment and status at least every few months through early 2015. (*Id.* at 731, 736, 747, 758, 771, 779–80, 788, 796, 803, 810, 819.)

During the evaluation and administration of Carty's LTD claim, Dr. Smith and Dr. Latham completed ongoing MetLife paperwork related to Carty's symptoms and impairment and continued to describe symptoms consistent with an inability to consistently perform job duties comparable to those he had performed at Eastman. (*Id.* at 432–33, 595–96.) For example, on November 7, 2013, Dr. Latham identified the following symptoms "that would impair [Carty] from performing work related activities": "[p]oor followthrough, inconsistent emotional reactions accompanied by brooding that notably limited work behavior, along w[ith] reduced concentration, excessive rumination [and] racing thoughts, evolving mistrust, [and] increased social anxiety [and] insecurity in personal interaction." (*Id.* at 432.)

### D. Termination of Benefits

In March of 2015, MetLife senior psychological clinical specialist Kenneth Lemelle recommended a full file review of Carty's claim, due apparently to the infrequency of Carty's visits with Dr. Latham. (AR at 818–19.) MetLife sent a copy of Carty's file to psychiatrist Dr. Marcus Goldman for a physician consultant review. (*Id.* at 249–50.) Based on phone conversations with Dr. Smith and Dr. Latham and a review of Carty's file, Dr. Goldman concluded that Carty did not suffer from "severe debilitating psychiatric global functional impairments that preclude...him from performing the types of tasks required in the performance of any job he is qualified to perform at present." (*Id.* at 245.) Dr. Goldman wrote that "[t]he data . . . suggest that while this claimant may be a difficult and disagreeable person

there is no evidence that due to a mental illness he is globally impaired or incapable of work."

(*Id.*)  Dr. Goldman characterized these deficiencies as "character issues" and noted the "absence of gross cognitive dysfunction, active suicidal or homicidal thinking, or psychosis."  (*Id.*) Discussing Carty's frequent cancellation of meetings with Dr. Latham, Dr. Goldman opined that "[i]f in fact the claimant was too depressed to get out of bed it is unclear why he was not transitioned to a more intense level of care for inability to meet the ordinary demands of life." (*Id.*)  He concluded that Carty's failure to more regularly attend therapy rendered him noncompliant with his treatment program.  (*Id.*)  Dr. Goldman further observed that "[t]here is no evidence of gross disorganization in thinking, impaired processing, mania, overt vegetative signs, overt panic, disinhibited or volatile behavior, psychosis, somnolence, intoxication or measured cognitive dysfunction."  (*Id.*)  Dr. Goldman also disputed the severity of Carty's anxiety-related symptoms, writing that his "discussion with Dr. Smith revealed a presentation inconsistent with the degree of anxiety the claimant purports."  (*Id.*)

MetLife transmitted Dr. Goldman's report to Dr. Smith and Dr. Latham for their response.  Dr. Latham responded by fax on March 31, 2015, taking issue with both Dr. Goldman's interpretation of Carty's missed visits and Dr. Goldman's puzzlement at Carty's not having been placed in a more intensive treatment setting:

> I view [Carty's] cancellations and rescheduling as an indication of a bipolar and anxiety condition (waxing and waning intensity of emotion and his avoidance) – not as noncompliance.  Dr. Goldman questions why the patient was not transferred to a program of higher intensity – IOP [intensive outpatient].  The patient initially presented to me for help with interpersonal relations.  Dr. Smith was treating his bipolar issues and anxiety issues.  Help with interpersonal issues is what I have attempted to provide.  I am taking into account the concept of reactance and consider his to be high.  Given that our focus is interpersonal issues and his reactance is high, I cannot see how referral to a more intense treatment level would help in that regard.

(*Id.* at 239.)  Shortly thereafter, he followed up with an additional response by fax, which he

characterized as a "clarification of reasons for cancellations, no-shows, and re-schedulings." He noted that three such instances were weather-related and others were related to unspecified driving-related issues, one was the result of an unusual medication side effect, and one was due to a clerical error. (*Id.* at 238.)

By letter dated April 2, 2015, Dr. Smith responded by disputing Dr. Goldman's conclusion that Carty was not unable to work due to symptoms attributable to his bipolar disorder:

> [Carty's] functioning has been compromised. There are periods of anxiety, depression, panic, and a sense of vulnerability. He often has noted low energy and diminished interest. He reports diminished social activities. Periods of improvement have been transient. I do not believe the patient could maintain gainful employment without frequent episodes of missing work, having impaired performance based on psychiatric symptoms.

(*Id.* at 237.) Dr. Smith also noted that Carty had kept his appointment with Dr. Smith and been compliant with the medications Dr. Smith had prescribed. (*Id.*)

By letter dated April 17, 2015, MetLife informed Carty that his LTD benefits were being terminated because he no longer satisfied the Plan's definition of disability. The letter claims that MetLife "received updated medical information from psychologist Dr. Edward Latham and psychiatrist Ronald Smith showing that you are permanently disabled but [they] did not provide any notation of observed impairments supportive of a major mental illness." (*Id.* at 232.) Although the frequently confusing syntax of the letter leaves its meaning sometimes opaque, MetLife appears to suggest that the medical information from Dr. Latham indicates that Carty's "rigid thought process and inflexibility of thinking [are] more likely indicative of personality traits," as opposed, presumably, to symptoms of a mental illness or disorder. Of Dr. Smith, the letter writes, "There are no serious symptoms reported by you or observed by Dr. Smith, in the

most recent office visit Dr. Smith notes possible avoidance behaviors but no neurovegatatvie[1] [sic] symptoms." (*Id.*)  The agrammatical nature of the sentence leaves its meaning unclear, but MetLife appears to have been arguing that Dr. Smith's stated observation of serious symptoms related to anxiety, depression, and panic is negated by the fact that his most recent office visit showed no neurovegetative symptoms.  MetLife's conclusion was presented as follows (with no corrections made by the court):

> In summary, in review of the medical information on file and assessment from the Independent Physician Consultant the medical documentation does not continue to substantiate a severity of psychiatric condition demonstrated to continue to preclude your ability in normal daily activities or performing tasks needed in the perform and of any occupation.  The medical documentation from your treating physicians do not demonstrate a serious psychiatric symptoms or observation by the providers or report from you symptoms more reliably correlated with severe psychiatric dysfunction. You have not been observed or noted with consistently present and debilitating neurovegative symptoms of a mood disorder, or severe impairments inin self-care, or to have intrusive and obsessive thoughts. Therefore, the medical on file does not support continuing severe and debilitating psychiatric impairment that would preclude you from working any occupation at this time.

(*Id.* at 233.)

### *E. Appeal*

Carty appealed, including as exhibits to his appeal not only his records but also the recorded testimony of Dr. Smith and Dr. Latham.  (AR at 81–190.)  MetLife sent Carty's claim and appeal to be reviewed by an independent physician consultant, psychiatrist Randy Rummler.  (*Id.* at 80, 51.)   Dr. Rummler concluded that "[t]here is inadequate information to support impairment" for the relevant time period.  Like Dr. Goldman, Dr. Rummler focused in particular on Carty's argumentativeness, which Dr. Rummler characterized as "reflect[ing] primarily personality characteristics which could be addressed in ongoing therapy." (*Id.* at 49.)  He faulted

---

[1] "Neurovegetative" means "[c]oncerning that autonomic nervous system" – that is to say, "[t]he part of the nervous system that controls involuntary bodily functions." *Neurovegetative*, Taber's Cyclopedic Medical Dictionary (19th ed. 2001); *Autonomic nervous system*, *id.*

Carty's own failures to more regularly attend therapy for the failure to address the problem. (*Id.* at 49–50.) Dr. Rummler echoed Dr. Goldman's reasoning that, if Carty was too impaired to regularly attend sessions, he required a more aggressive intervention: "If an individual is too ill to attend regular therapy sessions, clearly the expected and anticipated intervention would be to increase the level of care to provide more intensive treatment." (*Id.* at 50.) Dr. Rummler opined that weekly therapy sessions would reflect the minimum adequate and expected treatment for Carty, which he had not received. Dr. Rummler further concluded that Dr. Smith's records were not adequate to demonstrate either manic symptoms or cognitive impairment and that ultimately Carty's symptoms showed a "lack of acuity to support impairment." (*Id.*)

MetLife sent Dr. Rummler's report to Carty, asking him to forward it to Dr. Smith and Dr. Latham for review. (*Id.* at 52.) Dr. Smith responded by clarifying which medicines Carty had found helpful but had been unable to afford, an issue that Dr. Rummler had identified as unclear. (*Id.* at 23.) Dr. Latham provided a lengthier response, in which he characterized Dr. Rummler's notes on Dr. Latham's treatment as "accurate but incomplete." (*Id.* at 25.) Regarding Carty's argumentativeness, Dr. Latham explained: "I see this as reflecting his anxiety and fear of loss of control, his bipolar behavior involving his grandiosity, the rigidity in his thinking, the impatience and [disinhibition] of bipolar patterns, pressured speech . . . , and his sense of injustice leading to anger leading to impaired thinking." (*Id.* at 26.) Dr. Latham tied this question in with the dichotomy, present in Dr. Goldman's analysis, between issues related to character and issues related to a mental illness or disorder: "When talking with Dr. Goldman I was asked and agreed to a quick question as to whether I would agree that [Carty's argumentativeness] might indicate character issues. From the review by Dr. Rummler I see he was referring to a personality disordered issue." (*Id.*) Dr. Latham agreed that he did not have a

regular schedule for seeing Carty and saw him only as arranged by Carty and that Carty frequently did not attend scheduled sessions. (*Id.* at 25.) On October 19, 2015, Dr. Rummler provided a revised version of the report, including an addendum addressing Dr. Smith's and Dr. Latham's comments. (*Id.* at 966.) He indicated that the comments resulted in no change in his prior opinion. (*Id.* at 974.)

By letter dated October 23, 2015, MetLife informed Carty that it was upholding the termination of his benefits. (*Id* at 4.) MetLife largely echoed Dr. Rummler's conclusions, both taking issue with the infrequency of Carty's therapy sessions and concluding that the record "did not support any psychiatric functional limitations that would prevent [Carty] from performing any occupation as of April 18, 2015." (*Id.* at 7.) MetLife also wrote that "[t]he frequency of appointments was not sufficient to represent adequate treatment in the presence of symptoms stated . . . ." (*Id.*) On November 9, 2015, Carty filed his Complaint in this case. (Docket No. 1.) The three motions for judgment on the record followed on May 31, 2016.

## LEGAL STANDARD

A denial of benefits challenged under ERISA is subject to *de novo* review unless the benefits plan gives the administrator discretionary authority in interpreting the plan and determining employee eligibility. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). When a plan administrator has such discretionary authority, a court reviews a decision to deny benefits only for whether it was arbitrary and capricious. *Miller v. Metro. Life Ins. Co.*, 925 F.2d 979, 983 (6th Cir. 1991) (citing *Firestone*, 489 U.S. at 115). "The arbitrary or capricious standard is the least demanding form of judicial review of administrative action." *Davis By & Through Farmers Bank & Capital Trust Co. of Frankfort, Ky. v. Ky. Fin. Cos. Ret. Plan*, 887 F.2d 689, 693 (6th Cir. 1989) (quoting *Pokratz v. Jones Dairy Farm*, 771 F.2d 206, 209 (7th Cir.

1985)).  Under this standard, the determination of an administrator will be upheld if it is "rational in light of the plan's provisions."  *McClain v. Eaton Corp. Disability Plan*, 740 F.3d 1059, 1064 (6th Cir. 2014) (quoting *Marks v. Newcourt Credit Grp., Inc.*, 342 F.3d 444, 457 (6th Cir. 2003)).  Stated differently, a claim administrator's decision is not arbitrary and capricious if it "is based on a reasonable interpretation of the plan."  *Shelby Cty. Health Care Corp. v. S. Council of Indus. Workers Health & Welfare Trust Fund*, 203 F.3d 926, 933–34 (6th Cir. 2000).

While this review is "not without some teeth, it is not all teeth."  *McClain*, 740 F.3d at 1064.  "A decision reviewed according to the arbitrary and capricious standard must be upheld if it results from a deliberate principled reasoning process and is supported by substantial evidence."  *Id.* (quoting *Schwalm v. Guardian Life Ins. Co. of Am.*, 626 F.3d 299, 308 (6th Cir. 2010)).  The court must review "the quality and quantity of the medical evidence and the opinions on both sides of the issues" to determine whether a reasoned explanation exists to support an administrator's decision.  *McDonald v. W.-S. Life Ins. Co.*, 347 F.3d 161, 172 (6th Cir. 2003).  "When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious."  *McClain*, 740 F.3d at 1065 (citing *Shields v. Reader's Digest Ass'n, Inc.*, 331 F.3d 536, 541 (6th Cir. 2003)).  Moreover, a court must accept an administrator's rational decision, if it is not arbitrary or capricious, even in the face of an equally rational interpretation of a plan offered by a participant.  *Gismondi v. United Techs. Corp.*, 408 F.3d 295, 298 (6th Cir. 2005) (citing *Morgan v. SKF USA, Inc.*, 385 F.3d 989, 992 (6th Cir. 2004)).

When analyzing whether an administrator's decision was arbitrary and capricious, a court should consider a potential conflict of interest arising when a plan administrator both evaluates claims for benefits and pays benefit claims.  *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 112

(2008).  Even where the claims administrator does not directly fund the benefits, a conflict may nevertheless exist to the extent that a company may be inclined to contract with an administrator more likely to deny claims.  *Id.* at 114–15.  In addition, "a plan administrator, in choosing the independent experts who are paid to assess a claim, is operating under a conflict of interest that provides it with a clear incentive to contract with individuals who are inclined to find in its favor that [a claimant] was not entitled to continued [disability] benefits."  *Kalish v. Liberty Mut./Liberty Life Assur. Co.*, 419 F.3d 501, 508 (6th Cir. 2005) (quoting *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 292 (6th Cir. 2005)).  Any potential conflict of interest does not change the standard of review, but it is a factor to consider in determining whether an administrator's decision was arbitrary and capricious.  *Glenn*, 554 U.S. at 115–16.

## ANALYSIS

Carty argues that MetLife has misinterpreted the definition of disability under the Plan; that it unreasonably credited Dr. Goldman and Dr. Rummler's conclusions about his disability over Dr. Smith's and Dr. Latham's, despite Dr. Smith and Dr. Latham having actually examined him; and that MetLife incorrectly concluded that Carty's missed appointments established that he was not receiving appropriate care and treatment.  Eastman and MetLife respond that each of MetLife's decisions reflects an exercise of its discretion under the Plan that was neither arbitrary nor capricious.

### I. Interpretation of Plan

Carty argues first that MetLife has misconstrued the provision of the Plan stating that, to be considered disabled after the first eighteen months of benefits, "you may not earn more than 50% of your pre-disability earnings from any employer in your local economy at any gainful occupation for which you are reasonably qualified taking into account your training, education

and experience." (AR at 1070.) Carty argues that the use of the phrase "may not earn" unambiguously establishes that this provision premises disability on an individual's actual earnings and that he never fell outside the provision because, after stopping work, he never actually earned 50% of his pre-disability salary. MetLife argues that, read in the context of the plan, the provision establishes not only that an individual may not receive LTD benefits while earning the threshold amount, but that a finding of disability requires that the individual be unable to do so due to his disabling condition.

Typically, the word "may" means "'hav[ing] permission to' or 'hav[ing] the liberty to' do something." *Old Life Ins. Co. of Am. v. Garcia*, 411 F.3d 605, 614 (6th Cir. 2005) (quoting Webster's New Collegiate Dictionary 704 (G. & C. Merriam Co.1981)), *adhered to as amended,*, 418 F.3d 546 (6th Cir. 2005). Carty accordingly reads the word "may" to refer to what the Plan permits a recipient to do without losing his disabled status. While Carty's reading is a fair interpretation of the relevant language taken in isolation, it makes little sense in the broader context of the Plan. "ERISA plans, like contracts, are to be construed as a whole." *Mitzel v. Anthem Life Ins. Co.*, 351 F. App'x 74, 90 (6th Cir. 2009) (quoting *Alexander v. Primerica Holdings, Inc.*, 967 F.2d 90, 93 (3d Cir.1992); *Miller v. Monumental Life Ins. Co.*, 502 F.3d 1245, 1250 (10th Cir. 2007)). The stated purpose of the Plan is to "provide[] continuing income when you are *unable* to work due to an extended disability." (AR at 1070 (emphasis added).) Other than the provision Carty has cited, there is no separate language in the definition of disability that refers to one's ability or inability to perform gainful work. Carty is, therefore, ultimately arguing for a plan where the touchstone for eligibility is not the inability to work, but merely un- or underemployment. Such a reading is in plain contravention of the purpose of the LTD benefit.

Carty is correct that the question of what one *may* do stands in contrast with what one *can* do, which is to say what one is "physically or mentally able to" do. *Can*, Merriam-Webster Dictionary (Online ed. 2016). The structure, purpose, and other provisions of the Plan make clear that it is intended to reach beneficiaries who are not able to work due to an underlying condition, and, in that regard, the Plan's word choice is at best confusing and arguably simply in error. Ultimately, though, it is not arbitrary and capricious to conclude that a party reading the relevant portion of the Plan as a whole, including the fact that it expressly declares itself to be a definition of disability, would understand that, despite the poor choice of words, the language Carty cites is directed at the ability to work, not merely whether one is actively working – that it deals not only with what the plan permits but what the recipient's condition permits. Because the Plan is unambiguously one addressed at long-term disability, not unemployment, and it was not arbitrary and capricious to favor that underlying purpose over a mechanically literal reading of the terms, Carty is not entitled to a reversal of MetLife's decision based on the language of the Plan alone.

## II. Impairment

Carty argues that Dr. Goldman and Dr. Rummler's failure to perform any face-to-face evaluation of Carty rendered them ill-positioned to evaluate his condition and impairments and that MetLife acted arbitrarily and capriciously in crediting their opinions over those of Dr. Smith and Dr. Latham, both of whom had extensive, in-person experience with Carty and his symptoms. MetLife responds that it considered all four doctors' opinions, and that it acted within its discretion in crediting the two who happened to rely on the notes and characterizations of the others, rather than on their own independent evaluations of Carty.

"Generally, when a plan administrator chooses to rely upon the medical opinion of one

doctor over that of another in determining whether a claimant is entitled to ERISA benefits, the plan administrator's decision cannot be said to have been arbitrary and capricious . . . ." *McDonald*, 347 F.3d at 169. Nevertheless, "[w]hether a doctor has physically examined the claimant is indeed one factor that [the court] may consider in determining whether a plan administrator acted arbitrarily and capriciously in giving greater weight to the opinion of its consulting physician." *Kalish v. Liberty Mut./Liberty Life Assur. Co. of Boston*, 419 F.3d 501, 508 (6th Cir. 2005) (citing *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 295 (6th Cir. 2005)).

The Sixth Circuit has favorably cited the Southern District of New York's explanation, in *Sheehan v. Metropolitan Life Insurance. Co.*, 368 F.Supp.2d 228 (S.D.N.Y.2005), for why the preference for in-person examination may be particularly strong in psychiatric cases:

> Courts discount the opinions of psychiatrists who have never seen the patient for obvious reasons. Unlike cardiologists or orthopedics, who can formulate medical opinions based upon objective findings derived from objective clinical tests, the psychiatrist typically treats his patient's subjective symptoms. . . . [W]hen a psychiatrist evaluates a patient's mental condition, "a lot of this depends on interviewing the patient and spending time with the patient," . . . a methodology essential to understanding and treating the fears, anxieties, depression, and other subjective symptoms the patient describes.

*Smith v. Bayer Corp. Long Term Disability Plan*, 275 F. App'x 495, 508 (6th Cir. 2008) (quoting *Sheehan*, 368 F.Supp.2d at 254–55). Even if in-person examination is favored, however, "reliance on a file review does not, standing alone, require the conclusion that [the administrator] acted improperly." *Calvert*, 409 F.3d at 295.

A review of MetLife's process and conclusions raises serious doubts as to whether its ultimate decision regarding Carty's level of impairment was "the result of a deliberate[,] principled reasoning process," *McClain*, 740 F.3d at 1064, particularly in light of Dr. Smith's and Dr. Latham's superior position to directly evaluate Carty's symptoms, personality, and

behaviors. ERISA requires a denial of a beneficiary's claim to be "written in a manner calculated to be understood by the participant." 29 U.S.C.A. § 1133. MetLife's April 17, 2015 letter falls far short of the clarity required to give Carty appropriate notice of why his Plan had revised its position on his disability. At best, it offers a conclusory denial of the severity of Carty's symptoms. Even focusing on the somewhat clearer denial on appeal, much of MetLife's rationale relies on simply reclassifying Carty's disabling symptoms, with little explanation, as related to his character rather than his underlying bipolar disorder. Dr. Latham, however, has written convincingly about how Carty's behaviors, including those that could be characterized as related to character, are traceable to bipolar disorder and the related symptoms. The only doctors who have actually evaluated Carty in person agree that his irritability and sometimes difficult nature were part and parcel of the deeper underlying psychological issues that originally brought about his disability.

Moreover, neither Dr. Goldman nor Dr. Rummler addresses the full array of potentially disabling symptoms identified by Dr. Smith and Dr. Latham. Dr. Goldman largely devotes his conclusions to supplying a laundry list of the symptoms Carty does not have, whereas Dr. Rummler primarily focuses on the narrow issue of whether Carty has sufficiently disabling problems with attention and concentration. Neither provides a reasonable basis for disregarding Carty's doctors' accounts of his inability to cope with stressors or reliably honor basic attendance commitments. The opinion of a file reviewer is especially problematic when he overlooks relevant evidence and bases his conclusions on a selective, incomplete reading of the file. *See, e.g.*, *Javery v. Lucent Techs., Inc. Long Term Disability Plan for Mgmt. or LBA Employees*, 741 F.3d 686, 702 (6th Cir. 2014). MetLife's reviewers offer no explanation for how Carty, who has demonstrated a lengthy period of being unable to deal consistently with even minor household

tasks or keep the intermittent appointments that he himself made, can be expected to meet the demands of a job with set hours and attendance requirements, to say nothing of the numerous ordinary workplace stressors that his doctors have identified as likely to exacerbate his condition. In light of the file reviewers' already inferior position in evaluating Carty, crediting their conclusions without their having more fully and comprehensively addressed Carty's identified symptoms was arbitrary and capricious.

### III. Appropriate Care and Treatment

MetLife's denial on appeal suggests, however, that, even if Carty was still impaired by his bipolar disorder, MetLife may have had an alternative ground for termination because he was not receiving appropriate care and treatment. For treatment to be adequate under the Plan, it must be "consistent in type, frequency, and duration of treatment with relevant guidelines of national medical research, health care coverage organization and governmental agencies applicable to [the recipient's] condition." (AR at 1070.) Dr. Rummler opined that Carty required "weekly psychotherapy visits at a minimum" and that many of his issues "could be addressed in ongoing therapy" if Carty availed himself of it. (*Id.* at 49–50.) Dr. Goldman similarly took issue with Carty's history of missing psychotherapy. (*Id.* at 245.) Neither reviewer, however, cited any relevant authoritative guidelines in support of their largely conclusory opinions on the adequacy of care. Here, as well, the fact that neither Dr. Goldman nor Dr. Rummler actually examined Carty undermines the persuasiveness of their positions. Dr. Latham, who had extensive in-person experience with Carty, offered an account of how his unreliable attendance was often caused by his symptoms and how Carty's disposition rendered him a poor candidate for more intensive treatment. Dr. Goldman's and Dr. Rummler's opinions reflect no such individualized analysis.

The flaws in MetLife's process are exacerbated by the fact that Carty appears to have been given little warning that MetLife's termination decision was going to be based on anything other than its evaluation of his level of impairment, limiting his ability to mount a full defense. The Sixth Circuit has held that a plan administrator violates ERISA's notice provisions if the original termination notice "implied one basis for its termination of benefits, but then in its final decision letter included an entirely new basis." *Wenner v. Sun Life Assur. Co. of Canada*, 482 F.3d 878, 882 (6th Cir. 2007). Although Dr. Goldman's and Dr. Rummler's reviews questioned the frequency of Carty's psychotherapy attendance, MetLife's original denial was premised solely on Carty's supposed lack of "continuing severe and debilitating psychiatric impairment that would preclude you from working any occupation at this time." (AR at 233.) That letter made passing reference to Carty's compliance issues, but only in the context of a discussion of the acuity of his impairments. (*Id.* at 232.) A formal finding that Carty was not receiving appropriate care and treatment only appeared later, at the final denial on appeal. (*Id.* at 7.)

While Carty and his doctors were aware that issues had been raised about whether Carty was in compliance with his treatment regimen with regard to psychotherapy with Dr. Latham, that issue is just one component of the larger question of whether Carty's course of treatment, as a whole, was appropriate. That question involves not only the frequency of psychotherapy, but the adequacy of his psychiatric treatment with Dr. Smith, as well as the division of responsibility between Dr. Smith and Dr. Latham. A review of both doctors' records shows that, while Dr. Latham and Carty did address issues surrounding his bipolar disorder in some instances, that diagnosis was, over time, not the sole, or necessarily even the primary, focus of Dr. Latham's treatment. Dr. Smith, however, was consistently focused on making appropriate pharmaceutical interventions related to the bipolar disorder diagnosis. It is difficult, then, to justify a conclusion

about the appropriateness of Carty's treatment regimen that focuses solely on his attendance with Dr. Latham.

In light of the cumulative deficiencies in MetLife's process and reasoning, the court is persuaded that MetLife acted arbitrarily and capriciously in concluding that Carty was no longer impaired and that he was not receiving appropriate care and treatment. While MetLife has broad discretion in administering its plan and in choosing which professional opinions to credit, that discretion is not wholly unfettered. MetLife had an obligation to take all of Carty's documented symptoms into account – not merely the narrow ones focused on by Dr. Goldman and Dr. Rummler – and to afford Carty the opportunity to defend the adequacy of his treatment as a whole. While MetLife was permitted to rely on Dr. Goldman's and Dr. Rummler's file reviews, their lack of in-person evaluation of Carty, as well as their inherent conflicts of interest as MeLife's chosen reviewers, render their opinions an insufficiently firm foundation to support an analysis as flawed or incomplete in its details as MetLife's. Judgment will therefore be granted to Carty.

### IV. Remedy

Carty asks the court to order that his claim for ongoing benefits be approved or, in the alternative, to remand the case to MetLife for further proceedings consistent with the Plan. As the Sixth Circuit has held, "where the 'problem is with the integrity of [the plan's] decision-making process," rather than 'that [a claimant] was denied benefits to which he was clearly entitled,' the appropriate remedy generally is remand to the plan administrator." *Elliott v. Metro. Life Ins. Co.*, 473 F.3d 613, 622 (6th Cir. 2006) (quoting *Buffonge v. Prudential Ins. Co. of America*, 426 F.3d 20, 31 (1st Cir. 2005)). Although Carty has identified both substantive and procedural flaws in MetLife's decision, he has not gone so far as to establish that he is clearly

entitled to ongoing benefits. For example, questions still exist as to whether his care and treatment, viewed comprehensively, are appropriate. Moreover, while MetLife erred in focusing narrowly on some of Carty's claimed symptoms at the expense of others and failing to account for his doctors' superior position based on their in-person evaluation of Carty, those errors alone do not preclude the possibility that a more searching review would reach a similar conclusion. Because the discretion to administer the Plan is ultimately still MetLife's to exercise, the court will remand the case for further proceedings.

## CONCLUSION

For the foregoing reasons, Eastman and MetLife's Motions for Judgment on the Administrative Record will be denied, Carty's Motion for Judgment on the ERISA Record will be granted, and Carty's claim will be remanded to MetLife for further review.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge